# Supreme Court of Florida

_____

No. SC15-1881
_____

**NANCY HOOKER,**
Petitioner,

vs.

**TIMOTHY I. HOOKER,**
Respondent.

_____

No. SC16-589
_____

**TIMOTHY I. HOOKER,**
Petitioner,

vs.

**NANCY HOOKER,**
Respondent.

[March 30, 2017]

PARIENTE, J.

The issue in this dissolution of marriage case is whether the Fourth District Court of Appeal applied an improper standard of review to the trial court's factual findings regarding whether a spouse had donative intent to establish that property

was an interspousal gift and, therefore, included in the marital estate subject to equitable distribution. Hooker v. Hooker, 174 So. 3d 507, 511 (Fla. 4th DCA 2015). Nancy Hooker (Wife) petitioned this Court for review. We accepted jurisdiction because the Fourth District's opinion expressly and directly conflicts with this Court's decision in Shaw v. Shaw, 334 So. 2d 13 (Fla. 1976), the First District Court of Appeal's decision in Merrill v. Merrill, 357 So. 2d 792 (Fla. 1st DCA 1978), and the Third District Court of Appeal's decision in Abreu v. Amaro, 534 So. 2d 771 (Fla. 3d DCA 1988), on a question of law. We have jurisdiction. See art. V, § 3(b)(3), Fla. Const.[1]

We conclude that the appropriate standard of review is competent, substantial evidence. And, in this case, the Fourth District improperly reweighed

---

1. The Husband also filed a notice to invoke this Court's discretionary jurisdiction on the same basis of conflict as the Wife—the standard of review employed by the Fourth District—but challenged the rulings of the trial court and Fourth District concerning a separate piece of property. The Husband's petition for review resulted in Case No. SC16-589. Because this Court had already accepted jurisdiction to review the Fourth District's decision based on the Wife's petition in Case No. SC15-1881, we granted an unopposed motion to dispense with additional jurisdictional briefing and to consolidate the two cases. See, e.g., Westerheide v. State, 831 So. 2d 93, 105 (Fla. 2002) ("[O]nce an appellate court has jurisdiction it may . . . consider any item that may affect the case."); Leisure Resorts, Inc. v. Frank J. Rooney, Inc., 654 So. 2d 911, 912 (Fla. 1995) ("Having accepted jurisdiction, we may review the district court's decision for any error."); Savoie v. State, 422 So. 2d 308, 312 (Fla. 1982) ("[O]nce this Court has jurisdiction of a cause, it has jurisdiction to consider all issues appropriately raised in the appellate process, as though the case had originally come to this Court on appeal.").

the evidence under a preponderance of the evidence standard. Finally, we conclude that the record contains competent, substantial evidence to support the trial court's findings that both properties at issue were marital and, therefore, subject to equitable distribution. Accordingly, we affirm in part and quash in part the Fourth District's decision, which results in reinstating the trial court's Amended Final Judgment.

## BACKGROUND

Nancy and Timothy Hooker were married in September 1987 in New York. In 1989, the Hookers moved to Florida. Before their marriage, the parties executed a prenuptial agreement, the validity of which is not disputed. Pertinent to this dispute, the prenuptial agreement provided that, upon dissolution, each party would retain his or her premarital assets and any appreciation of those assets. Both parties had independent sources of income from family inheritances, and they maintained independent finances throughout the marriage.[2] The parties had a

---

2. Husband's annual income averaged between $170,000 and $200,000; Wife's was approximately $306,996 per year. During the marriage, the parties maintained separate bank accounts. Neither party was ever a signatory on the other's accounts. As the trial court explained, "[t]he only common bank account the parties shared was a joint checking household account used to pay common household expenses, which . . . the parties agree is a marital asset. The Husband alone funded this account with deposits from his SunTrust [account]." Husband's deposits to the account for family/household expenses ranged from $1,000 to $10,000 per month.

mutual passion for equestrian training, boarding, and showing, which was at the center of their marriage and their day-to-day activities.[3]

In 2010, following a twenty-three-year marriage, Wife petitioned for dissolution of marriage. At that time, the couple's net worth was $4,806,524. This property dispute results from the trial court's equitable distribution following the Hookers' dissolution of marriage. Two pieces of residential real property are relevant to this case: Hickstead and Lake George. At trial, Wife argued and presented evidence that Husband had donative intent with respect to Hickstead and Lake George and, therefore, these properties were marital assets as a result of interspousal gift. Husband disagreed, arguing that neither Hickstead nor Lake George was a marital asset and he never had the donative intent for either property to become a marital asset. Also relevant is Hooker Hollow, LLC, which was a company that Husband formed during the marriage.

---

3. While married, both parties worked in Husband's equestrian business—Timothy I. Hooker Horse Proprietorship. Prior to this company, the parties also worked in Husband's former company, Equestrian Development Management, Inc., which was shortly thereafter dissolved. Husband was also involved in other companies, such as Wellington Group Enterprises, LLC, and SPG Limited Partners, Ltd.

The first property, referred to as "Hickstead," is located in Wellington, Florida.[4] Husband purchased Hickstead in 1989 after Wife's father recommended the property as a beneficial investment. Husband's father also paid $25,000 for a lottery ticket, which provided Husband the opportunity to purchase Hickstead. Hooker, 174 So. 3d at 512. The Hickstead deed listed "Alice I. Hooker Trust FBO [("the AIH Trust")], for the benefit of, Timothy I. Hooker" as the grantee.

When Husband purchased Hickstead in 1989, it was vacant land. At the time of the dissolution of marriage over two decades later, Hickstead "was a working horse farm with 16 stalls and all the tack rooms and feed rooms that went with it, a jump field, a rod and ring, paddocks. . . . [O]ne wing upstairs had [the marital] home that the children [and the parties] lived in and the other wing was the staff apartment."[5]

The second property, referred to as "Lake George," is located in Lake George, New York. Husband purchased Lake George in October 1997 for approximately $490,000. Like Hickstead, Lake George was titled in only

---

4. The trial court and Fourth District alternatively refer to this property as "Hooker Hollow Place." To minimize confusion between this property and Husband's LLC (discussed below), this property is referred to herein as Hickstead.

5. See Hooker, 174 So. 3d at 510 ("This property was developed into a working horse farm and home. The parties lived in an apartment above the stables, which was the marital home throughout the majority of the marriage."). According to Husband, his AIH Trust spent approximately $70,000 improving Hickstead.

Husband's name. This property was "purchased, built and maintained as a summer residence for the family" where they "continue[d] to pursue and enjoy their horse activities during that season while residing together as a family in New York." The trial court explained that Husband paid the expenses for Lake George with his independent funds. Wife was never "a signatory on th[e] account nor [did] she ever ha[ve] access to the account" that Husband used for Lake George expenses. In April 2012, the fair market value of Lake George was approximately $2.5 million.

The trial court held a three-day trial during which both parties presented extensive evidence, including testimony from both Husband and Wife and other witnesses, such as accounting experts. In the trial court's Final Judgment, it found, in pertinent part:

> Hickstead [and Lake George] were more than . . . mere line item assets in the name of the Husband during their marriage. [They] were and should be considered joint marital assets of the Husband and Wife in equitable distribution by this Court, the way they were considered joint marital assets by the parties as they lived and raised a family in these "assets." While there was testimony from the Husband that he paid for these properties, the Husband also testified that he did not tell the Wife "one way or the other" whether she owned these marital residences. The facts are that the Husband and Wife treated their residential properties as marital assets. The Court finds that the conduct of the parties, including the conduct of the Husband, gives rise to the presumption that the parties intended to hold these residences as marital assets.
> The Court finds that based upon the evidence and conduct of the Husband, Wife and family during the marriage that Hickstead [and Lake George] are interspousal gifts from the Husband to the Wife.

(Emphasis added.)

Husband sought rehearing on the trial court's Final Judgment, "primarily challenging the trial court's determinations as to the interspousal gift to the Wife of an interest in [Hickstead] and Lake George." Hooker, 174 So. 3d at 511. As the Fourth District explained, in its Amended Final Judgment, the trial court:

> maintained its finding that, although the [Hickstead] and Lake George properties were purchased with the Husband's non-marital assets and were titled in his name alone, they should be considered marital assets because the Husband made an interspousal gift of an interest to the Wife, with their actions showing joint ownership. However, based on the rehearing, the trial court determined that an unequal distribution was warranted because of the substantial financial contribution of the Husband. Therefore, the court awarded 66% interest in the [Hickstead] property to the Husband and the remaining 34% to the Wife, and awarded 75% interest in the Lake George property to the Husband and the remaining 25% to the Wife.

Id.

Further supporting its conclusion that these properties were marital assets, the trial court recognized that Husband owned other pieces of real property that he treated differently than Hickstead and Lake George, or less like interspousal gifts. Specifically, the trial court stated, "In contrast to the evidence presented at the Final Hearing regarding the way the Husband exclusively handled his other real property, assets and investments, [Hickstead and Lake George] were treated as the joint family property of the Wife." Thus, the trial court concluded that Husband's actions substantiated donative intent with respect to Hickstead and Lake George.

- 7 -

Husband appealed the trial court's Amended Final Judgment to the Fourth District Court of Appeal. Upon review, the Fourth District stated that it accepted the trial court's factual determinations absent "an abuse of discretion" and reviewed the trial court's legal conclusions de novo. Id. (citations omitted). The Fourth District affirmed the trial court's determination as to Lake George but concluded that "the trial court erred in finding that the Wife had an interest in the [Hickstead] property by virtue of an interspousal gift." Id. at 513. As to Hickstead, the Fourth District stated:

> Under the preponderance of the credible evidence standard for finding donative intent, the facts found by the trial court do not evidence a clear donative intent by the Husband. . . . Rather, the facts regarding the Wife's involvement with [Hickstead] simply evidence that the Wife took care of her residence, regardless of ownership.

Id. (emphasis added).

Turning to the trial court's equitable distribution schedule, pursuant to section 61.075(1), Florida Statutes, the Fourth District reviewed whether there was competent, substantial evidence supporting the trial court's equitable distribution. Id. at 515. The Fourth District concluded that such evidence existed and the trial court's findings conformed to the statutory factors and affirmed the trial court's findings in its Amended Final Judgment, except the determination that Hickstead was an interspousal gift and, therefore, a marital asset. Id. at 515-16 (citing § 61.075, Fla. Stat. (2010)). Because it found that Hickstead should not be

- 8 -

included in the equitable distribution, the Fourth District remanded the case to the trial court for a revised equitable distribution excluding Hickstead.  Id. at 516.

## ANALYSIS

The issue in this case is determining the appropriate standard of review when an appellate court reviews a trial court's determination, in a dissolution of marriage, of whether a spouse had donative intent to establish that property was an interspousal gift and, therefore, included in the marital estate subject to equitable distribution.  Wife argues that the appropriate standard is "competent, substantial evidence," and the Fourth District erroneously concluded that the trial court's findings did not satisfy this standard.  Husband argues that, although a single sentence in the Fourth District's opinion could be interpreted to apply the wrong standard of review, Wife misreads the Fourth District's opinion, which correctly accepted the trial court's findings of fact.  However, Husband additionally argues in his answer brief/cross-initial brief on the merits that the Fourth District incorrectly applied the facts regarding Lake George to the law.

This analysis proceeds by outlining Florida's statutory equitable distribution framework and then analyzing the Fourth District's decision in the case below and the conflict cases.  We conclude that the proper standard is competent, substantial evidence, under which the appellate court shall not disturb the ruling of the trial court if it "is supported by competent evidence," especially where the evidence is

in conflict. <u>Shaw</u>, 334 So. 2d at 16; <u>see</u> <u>Merrill</u>, 357 So. 2d at 793 (At trial, the "question of donative intent is one of a preponderance of the credible evidence; and that question is for the chancellor, not for us."); <u>Laws v. Laws</u>, 364 So. 2d 798, 801 (Fla. 4th DCA 1978).

### A. Equitable Distribution in Florida

When a marriage is dissolved, Florida courts use equitable distribution to divide the marital property between the parties. § 61.075, Fla. Stat. (2016). As this Court previously explained:

> Under [Florida's equitable distribution] statute, the parties' assets are to be divided into two categories: (1) marital assets and liabilities and (2) nonmarital assets and liabilities. The statute defines assets and liabilities falling within each of these categories and establishes certain presumptions to assist in categorizing each asset and liability. The court then divides the marital assets and liabilities between the spouses.

<u>Robertson v. Robertson</u>, 593 So. 2d 491, 493 (Fla. 1991). While "the trial judge possesses the broad, discretionary authority to do equity between the parties," courts are to presume that an even division is equitable unless either party shows otherwise. <u>Acker v. Acker</u>, 904 So. 2d 384, 388 (Fla. 2005) (citing <u>Canakaris v. Canakaris</u>, 382 So. 2d 1197, 1202 (Fla. 1980)); <u>accord</u> § 61.075(1), Fla. Stat. (2016). As the Fifth District Court of Appeal explained in <u>Gardner v. Gardner</u>:

> Equitable distribution is a court evolved concept in Florida. It is used to achieve a fair division of marital assets, which are those assets acquired by the parties during their marriage from their work efforts, services, and earnings. In determining whether certain

- 10 -

property is a marital asset, the question is not which party holds title to the asset.

452 So. 2d 981, 983 (Fla. 5th DCA 1984).

Section 61.075 provides several ways in which property may be considered marital. See § 61.075(6)(a)1., Fla. Stat. (2016) (defining "marital assets"). The most relevant to this case is that "[u]nder well-established statutory and case law, an interspousal gift during the marriage is a marital asset." Maddox v. Maddox, 750 So. 2d 693, 694 (Fla. 1st DCA 2000). As the Fourth District explained in Hooker, "An interspousal gift is established by showing '(1) donative intent, (2) delivery or possession of the gift, and (3) surrender of dominion and control of the gift.'" 174 So. 3d at 511 (quoting Vigo v. Vigo, 15 So. 3d 619, 622 (Fla. 3d DCA 2009)) (internal quotation marks omitted). In other words, "a gift is made when a donor, intending to make a gift, delivers the gift to the donee and relinquishes all possession and control of the gift." Mills v. Mills, 845 So. 2d 230, 233 (Fla. 3d DCA 2003). The basis of Wife's petition for review and Husband's cross-petition in this case are the factual findings made by the trial court as to whether Hickstead and Lake George should be considered interspousal gifts and subject to equitable distribution. Specifically, the parties contest whether the trial court correctly found that the requisite donative intent exists for Hickstead and Lake George to be considered interspousal gifts.

- 11 -

## B. Proper Standard of Review on Appeal

In a dissolution of marriage, the appropriate standard of review when an appellate court reviews a trial court's determination of whether property was an interspousal gift and, therefore, subject to equitable distribution is competent, substantial evidence. Applying this standard to these findings is consistent with our long-standing precedent, especially in cases involving dissolution of marriage.

In Shaw, this Court reviewed the Third District Court of Appeal's decision applying the "abuse of discretion" standard and ultimately "modif[ying] the amended final [trial] judgment" with respect to alimony obligations and child-related expenses. 334 So. 2d at 16. On appeal, this Court determined that the Third District's application of the abuse of discretion standard was erroneous, stating:

> It is clear that the function of the trial court is to evaluate and weigh the testimony and evidence based upon its observation of the bearing, demeanor and credibility of the witnesses appearing in the cause. It is not the function of the appellate court to substitute its judgment for that of the trial court through re-evaluation of the testimony and evidence from the record on appeal before it. The test . . . is whether the judgment of the trial court is supported by competent evidence.

Id. Ultimately, this Court quashed the Third District's modified judgment and remanded to the trial court to reinstate its final judgment, concluding that even though appellate courts "might honestly strike the financial balance and division of assets between the parties in a different fashion, [it was not] error or an abuse of

- 12 -

discretion for the trial court to arrive at the result it reached." Id. at 17. Similarly, in Merrill, the First District stated, "[At trial, the] question of donative intent is one of a preponderance of the credible evidence; and that question is for the chancellor, not for [the appellate court]." 357 So. 2d at 793 (emphasis added).

In contrast to Shaw and the conflict cases, the Fourth District erred in Hooker in its approach to reviewing the trial court's findings of donative intent to establish an interspousal gift. Rather than deferring to the trial court's findings and simply determining whether they were sufficiently supported by the record, as would have been appropriate under the "competent, substantial evidence" standard, the Fourth District reevaluated whether the evidence satisfied the preponderance of the evidence standard, which applied at trial. In other words, the Fourth District substituted its own judgment and findings of fact regarding whether an interspousal gift existed. See § 61.075, Fla. Stat.

After reviewing Florida's statutory equitable distribution framework and case law, we reiterate that the appropriate standard of review on appeal for reviewing whether a trial court was correct in determining whether donative intent existed to render an asset an interspousal gift and part of the marital estate is "competent, substantial evidence." It is clear, due to the trial court's "superior vantage point" in reviewing and weighing testimony and evidence presented at trial, that appellate courts are to defer to trial courts' findings of whether disputed

- 13 -

property is marital or nonmarital.  See Van v. Schmidt, 122 So. 3d 243, 258 (Fla. 2013).  Thus, the trial court's factual findings must not be disturbed on appeal unless unsupported by competent, substantial evidence.[6]

Accordingly, we turn now to review the Fourth District's decision in Hooker to determine whether the trial court's findings in this case—that Husband had donative intent with respect to Hickstead and Lake George, rendering these properties marital assets—were supported by competent, substantial evidence.

## THIS CASE

Having determined the correct standard of review, we now address whether competent, substantial evidence exists to support the trial court's findings that Husband had the requisite donative intent with respect to both Hickstead and Lake George to render these properties interspousal gifts and, therefore, marital property subject to equitable distribution.  We discuss each property below.

### A.  Hickstead

---

6.  Abreu, 534 So. 2d at 772; Shaw, 334 So. 2d at 16; see also Robertson, 593 So. 2d at 494 ("Clearly, there is ample support in this record for the conclusion that the husband did not meet his statutory burden of proving a special equity."); Laws, 364 So. 2d at 801 (" 'The question of donative intent is one of a preponderance of the credible evidence . . .'; but the finding of the chancellor as to donative intent is not binding on the appellate court where ' . . . there is no credible evidence of such intent below.' " (quoting Merrill, 357 So. 2d at 793) (citing Bickerstaff v. Bickerstaff, 358 So. 2d 590 (Fla. 1st DCA 1978)).

Hickstead, the Hookers' "working horse farm and home," is the first disputed property, which was the subject of the Fourth District's opinion. Hooker, 174 So. 3d at 510. Wife argues that the trial court correctly concluded that Hickstead was marital property through interspousal gift. Husband argues that the trial court was incorrect and Hickstead is, instead, a product of Husband's premarital assets, which were excluded from equitable distribution by the parties' prenuptial agreement. We conclude that the Fourth District erred in reversing the trial court's finding that Hickstead was marital property.

Pursuant to section 61.075(6)(a)1.c, Florida Statutes, the trial court concluded that "the Husband made an interspousal gift during the marriage to the Wife of an interest in Hickstead." On rehearing, the trial court determined that competent, substantial evidence existed to support this finding. In making this determination, the trial court reasoned that although Husband "purchased, financed and primarily paid for" Hickstead with his nonmarital assets, it "nonetheless should be considered marital assets." Similarly, although Hickstead was "titled primarily in the name of the Husband alone, that is not dispositive of whether [it] should be considered [a] marital asset[]." "Wife and Husband both signed the mortgage on . . . Hickstead." And, the trial court found that Hickstead was the parties' "marital residence[] throughout the vast majority of the marriage and where the parties raised their children and lived as a family." Indeed, "Wife was

- 15 -

extremely and directly involved in all aspects of the Hickstead . . . residence . . . which was the family's primary home for approximately twenty years."

In 1997, Husband formed Hooker Hollow.[7] Hooker, 174 So. 3d at 510. As the Fourth District explained, Husband's purpose for creating Hooker Hollow was "to turn [Hickstead] into a corporation and transfer part of the title to another entity. Only . . . Husband was listed as the seller, but both parties signed the warranty deed transferring title of [Hickstead] to [Hooker Hollow]." Id. Likewise, the trial court explained that Hooker Hollow "was an entity created during the marriage to hold the asset which is the Hickstead . . . marital home in Wellington, Florida." As to this transfer, the trial court explained:

> There was evidence that . . . the Wife actually signed the deed to that property when changing title to Hooker Hollow . . ., and the Wife signed closing documents/sale documents . . . . The Wife testified that she trusted the Husband with regard to documenting title to this property and transfer of title to this property, but she always understood from the actions of the Husband and the family that she had an interest in the Hickstead . . . residence and property.

That same year, Husband sold a half interest [in Hooker Hollow] for a million dollars to Trelawny Farm.

The Raether Family was the principal of Trelawny Farm. Through Hooker Hollow, the Raethers had a buyout option on Hickstead that they exercised in

---

7. Only Husband's name was listed in the Articles of Incorporation document for Hooker Hollow. Hooker, 174 So. 3d at 510.

- 16 -

2010. When Wife learned that Husband had no intention of sharing with her any of the proceeds from selling Hickstead to the Raethers, she immediately "filed for dissolution of marriage." Hooker, 174 So. 3d at 510.[8] Just after Wife filed for dissolution, the Raethers purchased Hickstead from Hooker Hollow for $4.5 million.

Reviewing all of the evidence related to Hickstead, the trial court stated:

> The totality of the testimony was that the Wife could and did treat [Hickstead] as her own. Although the living expenses of these properties were paid for from the Husband's assets, the Wife was not limited or restricted in any way from incurring the costs and expenses of maintaining and operating a family home at [Hickstead]. . . . Additionally, [Hickstead] provided the Wife unfettered access and use of the stables and horses to pursue her lifelong passion. . . . [I]t was clear from the evidence and testimony that while the horse business always lost money, the Husband and Wife centered their personal and social life around their love of horses. . . .
>
> [Hickstead] [was] more than [a] mere line item asset[] in the name of the Husband during their marriage. [This] propert[y] [was] and should be considered [a] joint marital asset[] of the Husband and Wife in equitable distribution by this Court, the way [it was] considered [a] joint marital asset[] by the parties as they lived and raised a family in [this] "asset[]."

Ultimately, the trial court concluded:

> The Husband through his actions, or relative inaction, over the many years the family lived in [Hickstead] confirmed an interspousal gift to

---

8. Wife also filed a lis pendens on Hickstead and a motion to freeze the proceeds of the sale pending the outcome of the dissolution. Hooker, 174 So. 3d at 510. To relieve the lis pendens and freeze on the proceeds from the sale, the parties agreed that Wife would receive $1,000,000 from the sale of Hickstead up front without prejudice, which would later be either returned or supplemented after equitable distribution was determined in the dissolution of marriage. Id.

- 17 -

the Wife. The Court finds that the conduct of the parties, including the conduct of the Husband, demonstrates and establishes a donative intent of the Husband, delivery or possession of an interest in [Hickstead] . . . as a gift to the Wife and surrender of dominion and control of those properties to the Wife.

When Husband purchased Hickstead in 1989, after the parties were married, it was vacant land. When Hooker Hollow sold Hickstead to the Raethers in 2010, Hickstead was a fully functional horse farm worth $4.5 million. Husband recognized that Wife "was very active in the design and the construction, taking care of the barn."

The transfer of Hickstead through Hooker Hollow is the most significant indication of donative intent. Hooker Hollow was formed during the marriage on June 30, 1997. Accordingly, the trial court found that Hooker Hollow was a marital asset because it was "created during the marriage to hold the asset which is the marital home in Wellington, Florida," as testified to by Wife's forensic accountant. See § 61.075(6)(a)1.a., Fla. Stat. (2016). Before selling Hickstead, Husband told Wife that it was in their best interests to convey Hickstead to Hooker Hollow.

Further, after transferring Hickstead to Hooker Hollow and continuing to use Hickstead as the marital home for another decade, Husband authorized the sale of Hickstead from Hooker Hollow to the Raethers. At that time, Husband owned 50% of Hooker Hollow, and the Raethers owned the other 50% through their

company, Trelawny Farm.  <u>Hooker</u>, 174 So. 3d at 510.  In 2010, when Hooker Hollow sold Hickstead to the Raethers, Hooker Hollow was marital property, as the trial court found.  Thus, Hickstead is marital property subject to equitable distribution as an asset of Hooker Hollow.[9]

While one factor independently—such as Wife signing the Warranty Deed or being listed on the mortgage, or Wife's unfettered access to and autonomy in residing, maintaining, and improving Hickstead—does not establish an interspousal gift for purposes of equitable distribution in a dissolution of marriage, viewing Husband's actions comprehensively leads us to conclude that competent, substantial evidence supports the trial court's finding that Hickstead was an interspousal gift, of which Husband intended to divest himself of complete dominion and control to his Wife.

## B.  Lake George

The second property at issue is Lake George.  Wife argues that Lake George falls squarely within the statutory definition of "interspousal gift" as an anniversary gift from Husband to Wife.  Husband argues that Lake George is excluded from the marital estate under the parties' prenuptial agreement because it was acquired

---

9.  Of course, the value of Hickstead would be distributed rather than possession of the property since Husband sold Hickstead to the Raethers.  Thus, the dispute is over Wife's interest in the proceeds from the 2010 sale of Hickstead.

solely by his premarital assets. We agree with the Fourth District that the record contains competent, substantial evidence to support the trial court's finding that Lake George is marital property subject to equitable distribution.

Lake George was "the family's summer residence throughout the vast majority of the marriage." Hooker, 174 So. 3d at 514. Like Hickstead, Husband purchased Lake George "with funds that can be traced to his pre-marital assets kept separate by the parties' prenuptial agreement." Id. at 511. Likewise, Husband was the only signatory on the title and promissory note for the mortgage on Lake George through CitiBank. However, as the trial court recognized, title is not dispositive in this inquiry. Gardner, 452 So. 2d at 983. As the Fourth District explained:

> The Husband's "clear and unmistakable" intention with the Lake George property was, at least in part, as a gift to the Wife, which was established through the Wife's testimony about the Husband sending her a card for their tenth wedding anniversary with a picture of the property. This was after the Wife had expressed her desire to have a home up north and both parties searched for a suitable property. Additionally, the Wife purchased some furnishings and incidentals for the home from her separate funds.
> . . . .
> Because there is evidence of donative intent with regards to the Lake George property, we turn to the remaining two elements of a gift: delivery or possession and surrender of dominion and control. . . . In regards to delivery or possession, we hold the trial court did not abuse its discretion in finding that delivery was made at the time the Wife obtained keys to the property and began to possess the property as her summer home according to the intention of the Husband. Also, . . . the evidence is uncontroverted that the Wife had unfettered access to the home and made decisions on care and maintenance of the

property with the ability to incur expenses on behalf of the Husband, evidencing the Husband's surrender of control to her, at least in part.

Because the evidence supports the trial court's determination that an interspousal gift of an interest in the Lake George property occurred, the property was subject to equitable distribution as a marital asset.

Hooker, 174 So. 3d at 514. Accordingly, the Fourth District affirmed the trial court's distribution of Lake George. Id. In light of the trial court's findings of fact, the evidence in the record, and the Fourth District's analysis, we agree with the Fourth District that competent, substantial evidence supports the trial court's determination that Lake George was marital property subject to equitable distribution.

## CONCLUSION

We conclude that the proper standard of review on appeal when reviewing a trial court's determination, in a dissolution of marriage, of whether a spouse had donative intent to establish that property was an interspousal gift subject to equitable distribution is "competent, substantial evidence." In this case, we conclude that such evidence existed to support the trial judge's conclusion that both properties at issue were marital assets under section 61.075, Florida Statutes. Accordingly, we quash the Fourth District's ruling as to Hickstead and affirm as to Lake George, effectively reinstating the equitable distribution in the trial court's Amended Final Judgment.

It is so ordered.

- 21 -

LABARGA, C.J., and QUINCE, J., concur.
LEWIS, CANADY, and POLSTON, JJ., concur in result.
LAWSON, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

Application for Review of the Decision of the District Court of Appeal – Direct Conflict of Decisions

 Fourth District - Case No. 4D13-1841

 (Palm Beach County)

Robert J. Hauser of Pankauski Hauser PLLC, West Palm Beach, Florida; and Susan G. Chopin of Chopin & Chopin, LP, West Palm Beach, Florida,

 for Petitioner/Cross-Respondent

Jane Kreusler-Walsh, Rebecca Mercier Vargas, and Stephanie L. Serafin of the Law Office of Kreusler-Walsh, Compiani & Vargas, P.A., West Palm Beach, Florida; and Melinda P. Gamot of The Gamot Law Firm, P.L., Palm Beach Gardens, Florida,

 for Respondent/Cross-Petitioner