# Third District Court of Appeal

## State of Florida

Opinion filed October 27, 2021.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D19-2406
Lower Tribunal No. 14-10507
_____

**Jill Pardes, etc.,**
Appellant/Cross-Appellee,

vs.

**Andria Pardes,**
Appellee/Cross-Appellant.

An Appeal from the Circuit Court for Miami-Dade County, Stanford Blake, Voluntary Trial Resolution Judge.

Law Offices of Paul Morris, P.A., and Paul Morris; Law Offices of Kornreich & Assoc., and Gerald Kornreich and Amber Kornreich; Cotzen Law, P.A., and Michael Cotzen, for appellant/cross-appellee.

Barry S. Franklin & Associates, P.A., and Barry S. Franklin, for appellee/cross-appellant.

Before EMAS, LOGUE and SCALES, JJ.

EMAS, J.

## INTRODUCTION

Jill Pardes, as Personal Representative of the Estate of Michael Pardes ("Former Husband")[1] appeals the amended final judgment of dissolution of marriage. Andria Pardes ("Former Wife") cross-appeals the same final judgment. For the reasons that follow, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## BACKGROUND AND PROCEDURAL HISTORY

The parties, who have no minor children, were married for thirty-three years and, during the course of the marriage, separated several times and twice filed petitions for dissolution. During their separations, the parties entered into several postnuptial agreements addressing their substantial assets. Following a five-day nonjury trial held before voluntary trial resolution judge Stanford Blake,[2] the trial court issued the final judgment which is the subject of this appeal and cross-appeal.

---

[1] During the pending appellate proceedings Michael Pardes passed away. On August 4, 2021, Mr. Pardes' daughter, Jill Pardes, was substituted as the party-appellant in this appeal.

[2] More commonly referred to as a "private judge," Florida law recognizes that "parties who are involved in a civil dispute may agree in writing to submit the controversy to voluntary binding arbitration, or voluntary trial resolution, in lieu of litigation of the issues involved, prior to or after a lawsuit has been filed, provided no constitutional issue is involved." § 44.104(1), Fla. Stat. (2019) (entitled "Voluntary binding arbitration and voluntary trial resolution"). For ease of reference, we refer throughout the opinion to voluntary trial resolution judge Stanford Blake as "the trial court."

Former Husband asserts the trial court erred in: 1) failing to reimburse him for monies paid toward monthly household expenses, which Former Wife was contractually obligated to pay; 2) finding Former Husband breached one of the postnuptial agreements by failing to disclose to Former Wife an investment in a company called Crystal Bay (the "Crystal Bay Investment"); and 3) determining the residence at 584 Ocean Boulevard ("the Ocean Boulevard Residence") was nonmarital property of Former Wife.

Former Wife asserts the trial court erred in: 1) failing to include, in the calculation of Former Husband's net worth, an investment known as the "Stargate Mobile Investment"; 2) reimbursing Former Husband for monies he spent improving the Ocean Boulevard Residence; and 3) awarding certain artwork ("the Tremblay artwork") to Former Husband.

For the reasons that follow, we affirm the trial court's final judgment in all respects, except for the award of the Tremblay artwork to Former Husband.

## ANALYSIS

### A. Former Husband's Claims

1. Did the trial court err in failing to credit Former Husband for monies he paid toward monthly household expenses which Former Wife was contractually obligated to pay?

According to Former Husband, the parties entered into a postnuptial agreement in 2002 (the "2002 House Agreement"), which required Former Wife to pay $2800 monthly toward household expenses on the couple's marital home in Golden Beach (the "Golden Beach House"). Former Husband contends that because Former Wife failed to pay those expenses (thus requiring Former Husband to do so), the trial court erred in failing to credit Former Husband for those amounts.

Former Wife countered that 1) the parties subsequently agreed she would not have to pay the monthly household expense amount; and 2) the 2002 House Agreement was superseded by the couple's subsequent 2006 postnuptial agreement ("the 2006 Agreement"). The trial court found the greater weight of the evidence supported Former Wife's version of the events, and accordingly, did not credit Former Husband for the amount he claimed to be owed.

In reviewing a judgment rendered after a bench trial, any questions of law, including construction of the postnuptial agreements in the instant case, are reviewed de novo. Katz v. Riemer, 305 So. 3d 663 (Fla. 3d DCA 2020). In addition, typically, "the trial court's findings of fact come to the appellate court with a presumption of correctness and will not be disturbed unless they are clearly erroneous. Thus, they are reviewed for competent, substantial

4

evidence." Underwater Eng'g Servs., Inc. v. Utility Bd. of City of Key West, 194 So. 3d 437, 444 (Fla. 3d DCA 2016) (additional citations omitted).

This case, however, is atypical in one important respect: It was tried before a voluntary trial resolution judge, pursuant to section 44.104, Florida Statutes. As such, the parties are bound by the provisions of that law, including section 44.104(11), which provides:

> (11) Any party may enforce a final decision rendered in a voluntary trial by filing a petition for final judgment in the circuit court in the circuit in which the voluntary trial took place. Upon entry of final judgment by the circuit court, any party may appeal to the appropriate appellate court. *Factual findings determined in the voluntary trial are not subject to appeal.*

(Emphasis added). See also Witt v. La Gorce Country Club, Inc., 35 So. 3d 1033, 1040 (Fla. 3d DCA 2010) (holding that, pursuant to section 44.104(11), an appellate court is "bound by the factual findings of the trial resolution judge").

As such, the trial court's factual determinations—that the parties agreed Former Wife would no longer be responsible for the monthly household expenses, and that Former Husband never expected to be paid— are not subject to review by this court.[3]

---

[3] We note, however, that even if we were reviewing such a claim under our traditional standard of review, we would hold that the trial court's factual determinations are supported by competent substantial evidence.

5

In addition, and upon our de novo review, we conclude that the plain language of the 2006 Agreement modified the requirement (contained in the 2002 House Agreement) that Former Wife contribute to household expenses. The 2006 Agreement provided that the 2002 House Agreement would remain in effect "except to the extent it is modified by or inconsistent with the terms of this Agreement." This exception was triggered because, in that 2006 Agreement, the parties expressly agreed that Former Husband "shall pay all expenses attendant to and associated with" the marital home, thereby modifying the conflicting provision in the parties' 2002 House Agreement.

As a result of this modification, Former Wife was no longer obligated to pay the monthly household expenses. "When a contract is clear and unambiguous, 'the actual language used in the contract is the best evidence of the intent of the parties, and the plain meaning of that language controls.'" Anthony v. Anthony, 949 So. 2d 226, 227 (Fla. 3d DCA 2007) (quoting Maher v. Schumacher, 605 So. 2d 481, 482 (Fla. 3d DCA 1992)). See also City of Florida City v. Public Risk Mgmt. of Fla., 307 So. 3d 135, 138 (Fla. 3d DCA 2020) (same).[4]

---

[4] To the extent Former Husband argues that he was entitled, as a matter of law, to reimbursement for the monthly expenses which predated the 2006 Agreement, we note that Florida law does recognize the concept of

6

2.    Did the trial court err in finding Former Husband breached the 2006 Agreement by failing to disclose to Former Wife the Crystal Bay Investment?

Former Husband contends the trial court erred in finding he breached the 2006 Agreement by failing to disclose to Former Wife the Crystal Bay Investment.    As a result of this finding, the trial court ordered that the $1,618,555 Former Husband lost in this investment—a loss which Former Husband included in his net worth calculation—be removed as a liability in his net worth calculation.

Former Husband contends that the evidence at trial established that Former Wife was aware of the Crystal Bay investment, and thus there had been no breach of the 2006 Agreement.  However, the 2006 Agreement

---

abandonment by the conduct of the parties to a contract.  See Gustafson v. Jensen, 515 So. 2d 1298, 1300 (Fla. 3d DCA 1987) (holding: "In Florida, an antenuptial agreement may be abandoned by mutual consent without consideration"); McMullen v. McMullen, 185 So. 2d 191, 193 (Fla. 2d DCA 1966) (same and noting: "The abandonment of a contract may be effected by the acts of on one of the parties thereto where the acts of that party are inconsistent with the existence of the contract and are acquiesced in by the other party").  See also Sinclair Refining Co. v. Butler, 172 So. 2d 499 (Fla. 3d DCA 1965); Painter v. Painter, 823 So. 2d 268, 270 (Fla. 2d DCA 2002) (noting "abandonment of a contract . . . may be proved by showing that the acts of one party are inconsistent with the existence of the contract and that the other party acquiesced in those acts.") The trial court committed no error in applying these principles of contract law and we affirm this aspect of the final judgment.

plainly required Former Husband to obtain Former Wife's written consent before investing in the Crystal Bay Investment. Former Husband argues the parties' course of conduct was such that Former Wife's written consent was not required, only her knowledge and agreement to same. While Former Husband's premise may be correct (indeed, as we have already observed *supra* at note four, contracting parties may, by a course of conduct, abandon a contract), the trial court found as a matter of fact that Former Wife had no knowledge of the Crystal Bay Investment at the time Former Husband made the investment.

We hold the trial court committed no error of law, and Former Husband is bound by the trial court's findings of fact, which "are not subject to appeal by the parties." § 44.104(11), Fla. Stat. (2019).[5]

3. <u>Did the trial court err in determining the Ocean Boulevard Residence was nonmarital property of Former Wife?</u>

---

[5] Even if we were to review the challenged findings for competent substantial evidence, we would affirm the trial court's finding that Former Wife did not know of or approve the Crystal Bay Investment before that investment was made, and that Former Husband therefore breached the 2006 Agreement in this regard. See Corrales v. Corrales, 320 So. 3d 217, 220 (Fla. 3d DCA 2021) ("Recognizing 'the trial court's superior vantage point in assessing the credibility of witnesses and in making findings of fact,' we conclude the challenged findings are well-supported by competent, substantial evidence") (quoting Porter v. State, 788 So. 2d 917, 923 (Fla. 2001)).

Finally, Former Husband contends the trial court erred in determining the Ocean Boulevard Residence was nonmarital property of Former Wife. Although Former Husband acknowledges that Former Wife purchased the residence during the time of their prior separation, Former Husband asserts that the parties thereafter reconciled and lived at that residence together as a couple, and that it was their marital home for several years prior to Former Wife filing for divorce. Additionally, Former Husband asserts, he contributed monies to make several improvements to the Ocean Boulevard Residence. Relying on Hooker v. Hooker, 220 So. 3d 397 (Fla. 2017), Former Husband asserts that the trial court should have found the Ocean Boulevard Residence was a marital asset.

Section 61.075(6), Florida Statutes (2019), sets forth what is to be considered marital property in Florida:

(6) As used in this section:

(a) 1. "Marital assets and liabilities" include:
a. Assets acquired and liabilities incurred during the marriage, individually by either spouse or jointly by them.
b. The enhancement in value and appreciation of nonmarital assets resulting from the efforts of either party during the marriage or from the contribution to or expenditure thereon of marital funds or other forms of marital assets, or both.
c. The paydown of principal of a note and mortgage secured by nonmarital real property and a portion of any passive appreciation in the property, if the note and mortgage secured by the property are paid down from marital funds during the marriage. The portion of passive appreciation in the property

9

characterized as marital and subject to equitable distribution is determined by multiplying a coverture fraction by the passive appreciation in the property during the marriage.

. . .

**d. Interspousal gifts during the marriage.**

e. All vested and nonvested benefits, rights, and funds accrued during the marriage in retirement, pension, profit-sharing, annuity, deferred compensation, and insurance plans and programs.

2. All real property held by the parties as tenants by the entireties, whether acquired prior to or during the marriage, shall be presumed to be a marital asset. If, in any case, a party makes a claim to the contrary, the burden of proof shall be on the party asserting the claim that the subject property, or some portion thereof, is nonmarital.

3. All personal property titled jointly by the parties as tenants by the entireties, whether acquired prior to or during the marriage, shall be presumed to be a marital asset. In the event a party makes a claim to the contrary, the burden of proof shall be on the party asserting the claim that the subject property, or some portion thereof, is nonmarital.

4. The burden of proof to overcome the gift presumption shall be by clear and convincing evidence.

**(b) "Nonmarital assets and liabilities" include:**

1. Assets acquired and liabilities incurred by either party prior to the marriage, and assets acquired and liabilities incurred in exchange for such assets and liabilities;

2. Assets acquired separately by either party by noninterspousal gift, bequest, devise, or descent, and assets acquired in exchange for such assets;

3. All income derived from nonmarital assets during the marriage unless the income was treated, used, or relied upon by the parties as a marital asset;

**4. Assets and liabilities excluded from marital assets and liabilities by valid written agreement of the parties, and**

**assets acquired and liabilities incurred in exchange for such assets and liabilities; . . . .**

(Emphasis added). Relevant to this discussion, the parties' 2006 Agreement provides:

> Subject only to the terms of this Agreement and the [2002] House Agreement, each party hereto shall, during his or her lifetime, be the sole and exclusive owner of all of his or her respective separate property and shall have the sole and exclusive right to dispose of any and all such separate property during his or her lifetime, . . . as if the parties were never married.

It is undisputed the Ocean Boulevard Residence was purchased solely by Former Wife, using her own funds, during a period of separation from Former Husband (while dissolution proceedings were pending). Pursuant to the above provision of the 2006 Agreement, the Ocean Boulevard Residence would appear to be properly designated as Former Wife's "separate property." Nonetheless, Former Husband argues that because they lived there as a couple, made it their "marital home," and Former Wife allowed him to spend his own funds to improve the property, the residence should have been deemed marital property pursuant to Hooker.

In Hooker, the trial court determined that certain nonmarital property was (pursuant to the terms of a prenuptial agreement), in fact, marital property, because the titled spouse intended it to be an interspousal gift. On appeal, the Fourth District reversed the trial court's determination. See

11

Hooker v. Hooker, 174 So. 3d 507 (Fla. 4th DCA 2015). The Florida Supreme Court accepted jurisdiction to review the Fourth District's decision based upon our sister court's pronouncement that the proper appellate standard of review was a preponderance of the evidence. The Florida Supreme Court reversed, holding that "the proper standard of review on appeal when reviewing a trial court's determination, in a dissolution of marriage, of whether a spouse had donative intent to establish that property was an interspousal gift subject to equitable distribution is 'competent substantial evidence.'" Hooker, 220 So. 3d at 407.

Accordingly, the precedential heft of Hooker must necessarily be viewed in light of the impetus for the court's granting review, which was to reaffirm the proper standard of review in such cases. We acknowledge that, having reaffirmed that proper standard of review, the Court then evaluated the factual circumstances of the case and concluded that there was competent substantial evidence to support the trial court's determination that there was donative intent on the part of the titled spouse. Ultimately, the Court held that the Fourth District erred in reversing the trial court's determination that the property was marital property.

Former Husband relies on Hooker for the proposition that the trial court erred in the instant case in designating the property as nonmarital. Former

Husband's reliance on Hooker, however, is misplaced. Hooker did not establish any bright-line rule for when property must be designated as marital or nonmarital. Such a determination was (before Hooker) and remains (after Hooker) a fact-intensive determination. What Hooker did do is reaffirm that a trial court's factual determination on such an issue is to be reviewed for competent substantial evidence.

To that end, and as Former Wife correctly notes, Hooker actually undermines Former Husband's position, because the Florida Supreme Court did not "determine" that the property at issue was marital. Instead, the Court simply applied the proper standard of review to the facts *as found by the trial court*, concluding the trial court's findings were supported by competent substantial evidence, and held that the Fourth District should have affirmed the trial court's factual finding. This is precisely what Former Wife is urging this court to do—to affirm the trial court's factual findings because they are supported by competent substantial evidence presented at trial. Former Wife is correct. We note the trial court's determinations are supported by Florida law.

Hooker is further distinguishable because the "donative intent" on the part of the husband in Hooker was not the same as the intent of Former Wife in the instant case. While there was evidence presented in support of

13

Former Husband's position, there was also competent substantial evidence presented by Former Wife to support the trial court's finding that Former Wife did not intend to gift this property to Former Husband as a marital asset.

Once again, this court is bound by, and Former Husband is statutorily precluded from appealing, the factual findings made by the trial court. Witt, 35 So. 3d at 1040 (holding that, pursuant to section 44.104(11), an appellate court is "bound by the factual findings of the trial resolution judge").[6]

**Former Wife's Claims**

1) <u>Did the trial court err in failing to include the Stargate Mobile Investment in Former Husband's net worth?</u>

---

[6] Even if we were to review this claim under a standard of competent substantial evidence, the same result would follow: The couple had marital problems for years, and each had their own money and assets. They entered into several agreements to deal with the disposition of their property and one of those agreements (as discussed *supra*) expressly defined nonmarital property, which definition encompasses the Ocean Boulevard Residence. The evidence established that Former Wife bought the Ocean Boulevard Residence and title was always held in a land trust, upon the advice of her attorney during the prior divorce proceedings. Former Wife also spent substantial amounts of her own money on renovations and improvements, which she arranged and worked on with the contractors, and which were designed to suit her own personal tastes and preferences. There was also evidence that Former Husband had offered to buy a one-half interest in the Ocean Boulevard Residence while living there, an offer that Former Wife rejected. The Florida Supreme Court in Hooker minced no words in characterizing an appellate court's role in these cases: "It is clear, due to the trial court's 'superior vantage point' in reviewing and weighing testimony and evidence presented at trial, that appellate courts are to defer to trial courts' findings of whether disputed property is marital or nonmarital." Hooker, 220 So. 3d at 404.

14

This issue is similar to the one raised by Former Husband and discussed *supra* (Former Husband failed to disclose to Former Wife an investment in the Crystal Bay Investment). Here, however, the trial court made a factual finding that Former Husband *did* obtain Former Wife's oral consent before investing money in Stargate Mobile. The parties, and this reviewing court, are bound by this factual finding of the trial court.

Nevertheless, Former Wife contends that a factual finding that she orally consented to this investment is insufficient, because the unambiguous language of the 2006 Agreement required her prior *written* consent. As part of the 2006 Agreement, the parties agreed that in the event of their divorce, Former Husband would pay Former Wife a lump sum of $5.7 million, subject to an annual upward or downward adjustment tied to Former Husband's net worth at the time, to be calculated by a financial statement provided to Former Wife each year. That same section provides:

> 10.3 It is specifically understood that the Husband may utilize and liquidate his assets, from time to time, if necessary because his income is insufficient, to provide and pay for the ordinary and customary support and living expenses of the parties during their marriage. However, without the Wife's **prior written consent**, the Husband shall not transfer, convey, sell, pledge, hypothecate, encumber, dissipate, or gift any of his assets unless he replaces or substitutes such assets (or lost net value in the event, e.g., of an encumbrance) with other assets of equal or greater value.

15

10.3.1 The foregoing restriction is not intended to deprive the Husband from making what he considers to be prudent investment decisions. To illustrate, this Agreement is not intended to preclude the Husband's unilateral right to sell, e.g. 100 shares of stock in a corporation and use the proceeds from the sale thereof to purchase stock in another corporation having a then equal value. He may not, however, **without the Wife's prior written consent**, transfer those 100 shares of stock to anyone – not a child, not a friend, not in trust or otherwise – as a gift. Similarly, if the Husband were to borrow funds encumbering one or more of his assets as security therefor, he can unilaterally do so provided he uses the borrowed funds to purchase assets of equal value to the funds borrowed.

(Emphasis added).

Former Husband counters that written consent was not required because the terms of the parties' agreement were altered through their course of conduct: Former Wife never provided written consent, preferring to defer to her father's financial acumen and his blessing with regard to Former Husband's choice of investments. In its amended final judgment, the trial court found

the wife had at least tacit knowledge of the investment and while her Father didn't think it was a good investment, there was nothing sent to the Husband telling him not to do that investment. The Wife even testified that Stargate Mobile was like a Life Alert and thought it was a good idea if it could help find dogs. Therefore, the $1,700,000 investment will not be added back in the Husband's net worth.

Thus, the question for this court is whether the trial court properly considered the parties' course of conduct relative to investments by Former

16

Husband, or whether it should have followed the plain language of the 2006 Agreement, which required prior written consent. To the extent this issue involves a question of law, such as the interpretation of the contract itself, we apply a de novo standard of review. Katz, 305 So. 3d at 663, 666 (Fla. 3d DCA 2020) (holding that "'[a] postnuptial agreement is subject to interpretation like any other contract,' and a court's interpretation of a contract is subject to de novo review"). Also like any other contract, and as previously discussed, "contractual terms may be waived, both expressly and implicitly, by the party to whom the term benefits." Hammond v. DSY Dev., LLC, 951 So. 2d 985 (Fla. 3d DCA 2007). This includes a contractual provision requiring that certain contemplated action first be approved in writing. See e.g., Doral Country Club, Inc. v. Curcie Bros., Inc., 174 So. 2d 749 (Fla. 3d DCA 1965); General Elec. Capital Corp. v. Bio-Mass Tech, Inc., 136 So. 3d 698 (Fla. 2d DCA 2014); American Ideal Mgmt., Inc. v. Dale Village, Inc., 567 So. 2d 497 (Fla. 4th DCA 1990); Holman v. Halford, 518 So. 2d 442 (Fla. 1st DCA 1988).

We conclude that the trial court committed no error of law and that, pursuant to section 44.104(11), Former Wife is precluded from appealing the trial court's factual findings underlying this claim. We further note that, under

17

our traditional standard of review, the record contains competent substantial evidence to support those findings of fact.

2) <u>Did the trial court err in reimbursing Former Husband for monies he spent improving the Ocean Boulevard Residence?</u>

Although Former Husband claimed an entitlement to much more, the trial court awarded him $105,183.18 for monies he spent to improve the Ocean Boulevard Residence, expenditures for which he was not obligated to pay, and which were not contemplated under the 2006 Agreement. Former Wife asserts that the trial court should not have awarded Former Husband this amount because she objected to the work he paid for, and because the work—which she describes as "landscape improvements"—did nothing to increase the value of the home. However, the amount awarded by the court was based on calculations made by Former Wife's own expert, and included landscaping, installation of air conditioning, tile, and appliances. The Former Wife's expert testified that these items were "home improvements."

Although the 2006 Agreement required Former Husband to pay for "all the expenses attendant to and associated with such residence(s)," he was not required to pay for improvements to her separate property, including the Ocean Boulevard Residence. Accordingly, there was no error of law, and Former Wife (and this court) are bound by the factual findings of the trial

18

court (which are independently supported by competent substantial evidence).

3) <u>Did the trial court err in awarding the Tremblay artwork to Former Husband</u>?

In the 2002 House Agreement, the parties agreed that a particular piece of artwork purchased by Former Husband, ("the Tremblay artwork"), would be retained as Former Husband's separate property. However, in the 2006 Agreement, the parties agreed that Former Wife's "separate property shall include, but not be limited to, **all of the artwork**, jewelry (excluding the Husband's jewelry), furniture, furnishings, personal property and contents **currently located in the parties' marital residence.** It is specifically understood that the Wife shall have the sole option to remove any or all of the foregoing from the said marital residence upon her vacating the marital residence." (Emphasis added).

Nonetheless, the trial court awarded the Tremblay artwork to Former Husband, finding it was his nonmarital property. Because this issue is resolved upon the plain and unambiguous terms of the 2006 Agreement (which superseded the 2002 House Agreement to the extent it modified, or was inconsistent with, the 2002 House Agreement) we apply a de novo standard in reviewing this claim. <u>Hahamovitch v. Hahamovitch</u>, 174 So. 3d 983, 986 (Fla. 2015).

Former Husband contends the Tremblay artwork is his separate property under paragraph 7.1.1 of the 2006 Agreement, which provides the general definition of "separate property" as "[a]ll property, whether real or personal, tangible or intangible, heretofore or now owned by each party." However, such a contention ignores the more specific provision found in paragraph 7.3 of that same Agreement, which provides with particularity: "The Wife's separate property shall include, but not be limited to, all of the artwork . . . currently located in the parties' marital residence."

It is apodictic that, under contract law, the more specific contractual provision controls over the general provision. Papunen v. Bay Nat'l Title Co., 271 So. 3d 1108, 1111 (Fla. 3d DCA 2019) (observing: "[I]t is a general principle of contract interpretation that a specific provision dealing with a particular subject will control over a different provision dealing only generally with that same subject") (quoting Kel Homes, LLC v. Burris, 933 So. 2d 699, 703 (Fla. 2d DCA 2006); Idearc Media Corp. v. M.R. Friedman and G.A. Friedman, P.A., 985 So. 2d 1159, 1161 (Fla. 3d DCA 2008) (same). Based upon this specific provision in the 2006 Agreement, the trial court erred in awarding the Tremblay artwork to Former Husband.

**CONCLUSION**

We reverse only that portion of the Final Judgment with directions to amend the Final Judgment and award the Tremblay artwork to Former Wife. In all other respects, we affirm the thorough Final Judgment of the trial court.

Affirmed in part, reversed in part, and remanded with directions.